Parker, J.
The decree in this case ought in my opinion to be reversed, and the bill dismissed with costs.
In the view I take of the law applicable to the facts stated in the record, it is not very material to determine whether the girl Helen delivered to James Parsons the younger by the executrix and executor of the testator, was the one intended for Rebecca the complainant, or not. There is certainly sufficient indistinctness in the handwriting of the original will, to render it a very doubtful question of fact, whether the testator wrote Helen or Harriet; which ought to have been submitted to a jury, if the case turned upon it, and which serves to free all the parties concerned in the subsequent arrangement, by which the first named slave (sometimes called jEllen) was delivered to the appellant, and Harriet to Rebecca, from every imputation of fraud, or wilful substitution of the one for the other. This being so, I am willing to regard the case as one in which the representatives of the testator, intending to deliver to Rebecca the slave bequeathed to her, by mistake delivered to her another of equal value, whilst they assigned her slave to the appellant, as one of those to which he was entitled under the will: and in this, the strongest point of view for the appellees, I can see nothing to prevent the appellant from claiming the benefit of the act of limitations.
As soon as the executrix and executor attempted to distribute the property bequeathed by the will among the different legatees, they assented to the legacies, and vested the legal title in each one, according to his or her respective rights. Thus by delivering to Rebecca, with intent to comply with the will, a slave, although not the right one, they assented to the legacy of such slave as she was really entitled to, and the legal title passed. Any act done by an executor shewing that he wishes to carry the will of his testator into effect, and *500 that he does not desire to detain the property from the legatee for payment of debts or for any other purpose, is an assent (2 Wms. on Ex’ors 846.); and' here there was the most unequivocal evidence of consent to the bequest to Rebecca of two slaves, both of whom the executors supposed they hagl delivered at the same time that they distributed the other slaves among the rest of the legatees. After that distribution, the trust was at an end, and whether the slaves bequeathed got into the hands of third persons, or even returned to the possession of the executors, the legatees of James Parsons the eider might have maintained their actions at law to recover them, unimpeded by any difficulty about the legal estate. Doe v. Guy, 3 East 120. 2 Wms. on Ex’ors 849.
What then can prevent the appellant from claiming the benefit of the act of limitations ? His possession was adverse to all the world, and there can be no doubt that after five years he would have been protected against the action of the trustees. But in cases of this nature, the bar of the trustee is a bar of the cestui que trust. 2 Preston on Abstracts 380. And moreover, he was, at most, only constructively a trustee, or a trustee by implication; and confessedly, against such trusts, the act of limitations may run, so as to bar the cestuis que trust. Id. 377. and Kane v. Bloodgood, 7 Johns. Ch. Rep. 90. where all the cases are reviewed. The trusts unaffected in a court of equity by the act of limitations, are only the technical and continuing trusts which are not cognizable at law, but are the mere creatures of equity, falling within its proper, peculiar, and exclusive jurisdiction. But here the appellant never assumed any trust for the benefit of the appellee Rebecca, and if he was a trustee at all, he was such by implication ; and even that was at an end, after the representatives of James Parsons the elder divested themselves of the trust by assenting to the legacies, and perfecting, by delivery, the legal title of the legatees.
*501 The case, then, was one to which the plea of the act of limitations would certainly apply; and we have only to enquire whether the facts proved supported the defence set up by the appellant.
James Parsons the testator died in 1813. Rebecca Parsons and Isaac Parsons qualified to his will in April of that year. Soon after, they delivered the slaves bequeathed to the respective legatees, with intent to comply with the directions of their testator, and amongst them the slave Harriet to Rebecca the appellee, who was then about the age of 16, and the slave Helen to the appellant. In the year 1824 or 1825, Rebecca attained full age, and in 1833 this suit was brought. From the period of her majority, the act began to run, and no subsequent disability would arrest it. If therefore her marriage was afterwards (a fact not ascertained by the record) it would not avail her; and if it took place during her minority, she was bound to prove it (if not to reply it) in answer to the appellant’s plea. But suppose she had averred and proved that the disability of coverture occurred before the disability of infancy had ceased: this would bring up the question whether cumulative disabilities occurring in the same person will prevent the operation of the act. Considering the act as a wise and beneficial statute of repose, intended to quiet titles to property after the lapse of a reasonable time, without working injustice to claimants, I am of opinion that cumulative disabilities ought not to prevent its operation; and that, upon a sound construction of the act, a party claiming the benefit of the proviso can only avail himself of the disability existing when the right of action first accrued; since otherwise the assertion of claims might be postponed for the period of the longest life, and possessions disturbed after sixty, eighty, or even a hundred years. It is well settled in England, that if successive disabilities occur in different persons, they afford no protection. Doe v. Jesson, 6 East *502 SO. The american authorities go farther, and apply the same rule to disabilities in the same persons ; and there is no adjudged case in England to the contrary, although Blanshard and Preston have taken a distinction between successive disabilities in the same, and in different persons. The american authorities to which I refer, and which I am disposed to follow, are Eager and wife v. Commonwealth, 4 Mass. Rep. 182. Demarest v. Wynkoop, 3 Johns. Ch. Rep. 129. Jackson v. Wheat, 18 Johns. Rep. 40. Bradstreet v. Clarke, 12 Wend. 602. Thompson and others v. Smith, 7 Serg. & Rawle 209. Doe e. d. Lewis et al. v. Barksdale, 2 Brock. Rep. 436. to which may be added the case of Swann v. Selden, in this court, where I understand the same doctrine was recognized by judges Cahell and Brockenbrough.
Nor do I think that the executors were liable after such a lapse of time, and under the circumstances of this case. The trust was not a continuing one, but at an end when they assented to the legacies. They acted in good faith in delivering Harriet, instead of Helen, to the appellee Rebecca, for, being of equal value, they could have had no motive to act otherwise. This arrangement was acquiesced in for near 20 years, and for 8 or 9 after Rebecca attained the age of 21; and if Helen had died, instead of Harriet, we should have heard no complaint from the appellees. Under this state of things, it would, as I think, be inequitable to charge these representatives with.the value of the slave Helen, even admitting that she, and not Harriet, was the one designed for Rebecca'by the testator.
Brockenbrough, J.
From an inspection of the original will in this case (brought up by a subpoena duces tecum) it seems doubtful what was the name of the slave devised to Rebecca Parsons, now mrs. McCracken, the female appellee. It is difficult to make out either the name of Harriet or Helen. It is apparent that the *503 name begins with an H, and that there has been an alteration. This alteration was no doubt made by the authority of the testator before publication of the will, there being no suggestion to the contrary.
To my vision it appears that the word was first written Helen, in black ink: that it was altered with paler ink; the first e converted into a; then two Vs mounted on thei and second e (the tops of the two Vs in pale ink are plainly visible); then an i made out of the first member of the n, the dot of the i and the top of it being made in pale ink; then an e made out of the second member of the n; and the dash to the n, made originally with the black ink, converted into an obscure t, by a cross at the top of the dash with pale ink; thus making the name Harriet. Such is my impression, I may say my conviction, from the appearance of the paper.
But such is the confusion in the word, produced by the alteration, that parol evidence is, in my opinion, admissible to prove what slave was intended. It is apparent from the will itself, that the testator intended to bequeath a female and a male slave to his daughter Rebecca. He had three daughters, Betsy, Amanda Malvina and Rebecca, whom he meant to make equal. To each of them he gave one thousand dollars, to be paid at the age of twenty-one. In the same clause he says, “And to Betsy I give negroes Sally and Sambo (son of Jane)” (that is, a female and male negro); “to Amanda Malvina I give negroes Viney and Jerry” (another female and male); “ and to Rebecca I give negroes II- and Tom.” It seems morally certain that he intended to give a female negro with a name beginning with the letter before mentioned, and a negro boy Tom. But what female was intended ? Here is a latent ambiguity. If it were strictly a patent ambiguity, such as occurs when a blank is left for a devisee’s name in a will, then indeed no parol evi *504 dence would be admissible. Baylis v. Attorney General, 2 Atk. 239. 2 Williams on Executors 738. The result of this decision would be, that the plaintiff Rebecca would not be entitled to any female negro, and the bill would be dismissed. But the will shewing that a female negro was intended to be bequeathed (being probably Harriet or Helen) the ambiguity is latent, and susceptible of being explained by parol evidence. It is like the case of a blank for a Christian name only, or of a devise to mrs. G. in which cases the ambiguity was declared to be latent, and parol evidence admitted to explain who the person was. Price v. Page, 4 Ves. 680. Abbot v. Massie, 3 Ves. 148. 2 Williams on Executors 738.
If we admit the parol evidence, there can be little doubt that Harriet was the negro bequeathed, and not Helen. The answer of James Parsons the residuary legatee avers, that shortly after the death of the testator, the clerk of Hardy court furnished the executor with a copy of the will, in which the name written was Harriet. The clerk proves that he furnished the copy, and took pains to write the name exactly as it was written in the will; he does not say whether he copied it Harriet or Helen, or what it was, nor is that copy in the record ; so that the proof on that subject is not so strong as it might have been made. There were, however, only two females in the estate whose names began with an H. These were Hannah and Harriet. The former was superannuated, and she could not be the person. The scrivener, however, might have given another name beginning with H. by prefixing that aspirate to Ellen, there being a young slave known by the name of Ellen or Eleander. But that the name, though most probably written Helen originally, was subsequently changed to Harriet, is proved by the following evidence. The executor and executrix (the eldest son and widow of the testator) who saw the ori *505 ginal will, and had the first copy made out by the clerk, delivered Harriet to the plíúaúff Rebecca. They had no motive for giving up Harriet instead of Ellen, since the former was as valuable as the latter. Four members of the family, witnesses in the cause, prove that the testator had been heard to say that he intended Harriet for his ciaughter Rebecca; that Rebecca, both before and after the death of her father, claimed Harriet as hers; that the family, after the death of the testator, uniformly considered Harriet as belonging to Rebecca; that Rebecca, though a young lady under age, held Harriet as her own, and hired her out; and that Rebecca, when the defendant James Parsons, the residuary legatee, was about to sell Ellen to pay a debt of the testator, advised George Fisher to purchase her, thus disclaiming any right tojibe said Ellen. This is a mass of corroborative testimony, proving, to my satisfaction, that' Harriet, and not Helen, was the slave bequeathed. It is so strong, that I do not think it was necessary to direct an issue to try the fact. For this reason, I am of opinion that the decree should be reversed, and the bill dismissed.
But, secondly, admit that the name is Helen, and that by mistake the executors gave their assent to the legacy of Harriet, and delivered her as the slave bequeathed: can the appellee M'Gradeen and his wife Rebecca now recover Ellen and her offspring, or their value, from the residuary legatee James Parsons, to whom Ellen was delivered by the executors soon after the death of the testator ? or are they not barred by the statute of limitations ?
I will here remark, that if Rebecca Parsons had been of ago when the executors delivered to her the girl Harriet, and she had in due time, having discovered the mistake, filed her bill in equity against the executors to recover Ellen, she could not have recovered her, without tendering to restore Harriet to the executors or *506 to the residuary legatee, if Harriet was living. Equity would require the restoration as a condition of the recovery, because it would be iniquitous to recover both when only one was given. If Harriet had. died before the demand of Ellen, then a question might arise whether a loss occasioned by the act of God would fall on her who was in possession of Harriet, or on him to whom she belonged, and from whom the possession had been withheld. I incline to the opinion that Ellen and her offspring could not, in that case, have been recovered by Rebecca, without holding her responsible for the value of Harriet whilst living. Nor do I think that the circumstance of Rebecca's being under age when she received Harriet as the negro bequeathed to her, would make any difference. I apprehend that her infancy would not, in such case, change the rule of equity.
Passing over this question, however, let us next en-quire whether the appellees M'Cracken and wife are not barred by the act of limitations from a recovery against the appellant Parsons ? The executors assented to the legacy of Ellen with the other residuary estate to James Parsons, in 1813, soon after the death of the testator, and gave him possession of the said slave. This was an adversary possession, and he and Fisher held the possession till 1833, when this suit was brought. An adversary possession of a slave for five years confers of itself a legal title, and that adversary possession and title in James Parsons and Fisher is a complete protection to them against the demand of mrs. M,CracJcen, whether hers be a legal or an equitable claim, unless her disability of infancy or coverture extended to the period of the suit brought, or unless Parsons can be deprived of the benefit of the act by being a trustee for mrs. M’ Gradeen.
If she had the legal title to Ellen conferred on her by the assent of the executors, who by mistake gave the *507 possession to another, then unquestionably she is barred from asserting her legal right, by the adverse possession of five years in another, after her disability ceased.
But if the legal title to Ellen did not pass to the female appellee by the assent of the executors as aforesaid, (as I incline to think it did not*) yet her equitable title is barred as against her colegatee, though it may not be barred as against the executors. The statute of limitations is a good plea in equity, as well as at law; for though equitable actions are not within the words of the statute, yet the time prescribed by it has been adopted by courts of equity as a proper period for a bar in analogous cases.
Now, the executors having assented in 1813 that the legatees should take their respective legacies, the right of Rebecca Parsons to file her bill for the recovery of Ellen accrued at that period. At that time she was under the disability of infancy; but that disability ceased in 1824. If she married after she came of age (a fact not ascertained) her subsequent coverture was not a disability which would obstruct the operation of the statute: and even if she married whilst yet an infant, we cannot mount one disability on another, so as to present a continuous obstruction to its operation. This is abundantly shewn by my brother Parker, and I will not repeat his arguments, nor his authorities. The disability of infancy ceasing in 1824, and the suit not being brought till 1833, she is barred by the act.
*508 But it is said that the defendant James Parsons was a trustee, quoad the slave Ellen, for his sister, and that trusts are not within the statute. But this is not such a trust (if a trust at all) as will impede the operation of the statute. At most, he is only a constructive trustee ; and such a trust will not enable a cestui que trust to recover, who is otherwise barred. Kane v. Bloodgood, 7 Johns. Ch. Rep. 90. If the appellant be such a trustee, yet he has always denied the right of his cestui que trust to recover: he has held possession of the slave for nearly twenty years under a title adverse to hers, and he cannot be compelled to hold it under the same title, merely to enable her to set aside the statute. Hudsons v. Hudson's adm’r &c. 6 Munf. 352. As to the appellant James Parsons, then, the bill should have been dismissed.
The reversal of the decree as to the appellant will necessarily reverse it as to the executors; for as they were decreed to pay the money only in the event that the plaintiffs should fail to recover it by execution against the appellant, and as they can have no execution against the appellant, none can issue against the executors. But a question arises whether the bill should be directed to be dismissed against them also.
They have not pleaded the act of limitations; but, under the circumstances of the case, it would seem to me to be against equity to render any decree against them. They assented to the legacies, and delivered possession, as they understood the will, and as it was understood by the respective legatees: there was an acquiescence under this distribution for twenty years; for more than eight years after the female appellee arrived at full age, and for more than twelve years after Ellen was sold to pay the testator’s debts. By allowing this long period to elapse, she has enabled the residuary legatee to resist effectually the demand against him, and if a decree be now rendered against the exe *509 cutors, they would be forever precluded from recovering over against that legatee. I think, therefore, that the bill should likewise be dismissed against them.
On the whole, I repeat my opinion, 1st, that the female appellee never had a claim against either the executors or the residuary legatee,-the slave given to her being Harriet and not Ellen; and 2dly, that if it was Ellen, yet the act of limitations bars the recovery.
Tucker, P.
Upon inspecting the original will in this case, I think that the uncertainty as to the female slave intended to be given to Rebecca is so great, that she cannot be regarded as entitled to any particular female, though she had doubtless a right to some one out of the estate. One was accordingly assigned her, of equal value to Ellen; and after twenty years the transaction cannot be unravelled.
But admit that the doubtful name is Ellen or Helen (for with many persons the names might seem the same) yet the executors, in delivering over the legacies, as they were bound to do, have in good faith delivered to her Harriet, whom the female appellee preferred, and considered as the slave designed for her; and she accordingly accepted her, and hired her out till her death. Ellen, on the other hand, was delivered to the appellant, as part of his residuum, and has been sold for payment of the testator’s debts. Now, although Rebecca was under age, and might have objected if the wrong slave was delivered to her, yet it behooved her, or those holding her rights, to make the objection in reasonable time, at least after she came of age in 1824. For as in partitions, however irregular, length of time will give a sanction to the division, where there has be.en no fraud, unfairness or inequality (3 Call 13. 2 Rand. 418. 1 Atk. 542.) so, pari ratione, in the delivery of their legacies to specific legatees, although there be a mistake, and the slave of A. be given to B. and that of B. to A. yet if there is no wrong done, and all *510 the parties have acquiesced for years, a court of equity must quiet the respective parties in their possession. It will not permit them to hold back and wait the course of events; to abide by the distribution or allotment until circumstances change, or to keep themselves aloof, so as to enforce or abandon their right according as events may make it advantageous. In this case, had Harriet lived, and Ellen died without children, the appellees would doubtless have held on to the slave delivered to them as their legacy; and the death of Harriet and the fruitfulness of Ellen is the obvious occasion of the present controversy.
It is true that Rebecca was an infant; but she came of age in 1824, when her disability ceased; for, notwithstanding some loose opinions to the contrary, she cannot tack the disability of marriage to that of infancy. Swann v. Selden, lately decided in this court. Stowel v. Zouch, Plowd. 355. 2 Hen. & Munf. 306. Her claim, then, should have been asserted within five years from that date, for her brother’s possession was in every sense adverse to hers. Even if he. were a constructive trustee (which I doubt) yet the trust with which he is affected would not deprive him of the protection of the statute. Kane v. Bloodgood, 7 Johns. Ch. Rep. 123. Beckford and others v. Wade, 17 Ves. 97. Elmendorf v. Taylor, 10 Wheat. 168. Hudsons v. Hudson's adm'r &c. 6 Munf. 352. He is only a trustee for the sake of the remedy. He holds the legal title derived from the executors, claiming the slave as his property, and thus having a possession adversary to all the world. More than eight years have elapsed since the removal of his sister’s disability, so that the statute offers a perfect bar to her demand.
Upon the whole, I think the decree should be reversed, and the bill dismissed.
The other judges concurring, decree reversed and bill dismissed.

 Note by the judge. If a testator bequeath, a horse to A. and a mule to B. and the executor, intending to give his assent to these legacies, by mistake assent to B.’s taking the horse and A. the mule, or give possession in that way to the several legatees, does the legal title to the horse vest in A. so that he can recover him from B. in an action of detinue? I incline to think not, because the assent of the executor has never been given to A.’s taking tbe horse: his title is therefore still inchoate, and can only be enforced, I apprehend, in equity.